IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ADRIAN CARRADINE,

    Plaintiff,

v.

JO ANNE BARNHART,

    Defendant.

No. C 06-01612 CRB

**ORDER**

Adrian Carradine ("Plaintiff") applied for Supplemental Security Income. The Social Security Administration denied her application and rejected her request for reconsideration, ruling that she was not disabled under federal law. Plaintiff sought a hearing before an administrative law judge ("ALJ"), who affirmed the denial of benefits. Plaintiff appealed the ALJ's decision to this Court, pursuant to 42 U.S.C. §§ 405(g), 1383(c). Now pending before the Court are Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. See N.D. Cal. L.R. Civ. P. 16-5.

**BACKGROUND**

Plaintiff is a forty-four-year-old resident of Stockton, California. (CAR 54.)[1] She attended school through the sixth and into the seventh grade, during which time she suffered from learning disabilities and took special education classes. (CAR 161-62, 181.)

---

[1] All citations in this order refer to and use the pagination set forth in the Certified Administrative Record ("CAR").

1     Between 1985 and 2000, Plaintiff held six jobs, intermittently, for periods ranging
2 between one and ten months and for wages ranging between $6.25 and $11.00 per hour.
3 (CAR at 77.)  These positions included: a job sorting and hauling mail at a post office, which
4 ended after a leg injury left her temporarily unable to work, (CAR 77, 163-64); a temporary
5 job labeling equipment for a public school district, which ended when the school district's
6 short-term project had concluded (CAR 77, 169-70, 177); two jobs as a clerk at retail stores,
7 including Montgomery Ward, which ended because she was unable to perform certain
8 complex tasks, (CAR 77, 164-65); and two jobs as a cashier in fast food restaurants, which
9 ended because she was unable to fill orders or use a cash register with sufficient speed and
10 accuracy, (CAR 77, 167-69.)  In the five years when she worked, Plaintiff typically earned
11 around $1,600.  (CAR at 58.)   In one aberationally good year, when she worked at the post
12 office, Plaintiff earned close to $11,000.  (CAR at 58.)  In most years, however, the record
13 reflects no reported income at all.  (CAR at 58.)

14     Plaintiff applied for disability benefits on the ground that she suffers from depression,
15 stress, and insomnia.  (CAR at 54-56, 61-62.)  In her application, she reported taking Prozac,
16 Zoloft, and an unidentified sleeping pill for these conditions, as well as Ibuprofen and
17 Codeine for pain.  (CAR at 65, 81, 95.)  At her hearing, Plaintiff also reported a "locking"
18 phenomenon in her right hand and severe pain in her right wrist that "goes all the way up
19 [her] arm," though Plaintiff did not identify wrist pain as a disability in her application or
20 administrative appeal papers.  (CAR 61-62, 166.)

21     Plaintiff's medical records also reflect a variety of ailments.  For example, the record
22 contains a report submitted by a nurse practitioner named Barbara Turner, whom Plaintiff
23 identified as her primary caregiver.  (CAR at 150-54, 172.)  According to Plaintiff, this nurse
24 practitioner helped her obtain the various drugs that she uses to help manage her depression,
25 anxiety, insomnia, and pain.  (CAR at 172.)  The nurse practitioner's report notes that
26 Plaintiff complained of hand pain, the report provides a tentative diagnosis of fibromyalgia
27 and carpal tunnel syndrome.  (CAR at 150.)  The document also indicates that Plaintiff would
28 be unable to lift weights up to ten pounds more than occasionally, would be completely

2

1  unable to lift or carry weights heavier than twenty pounds, would have significant postural
2  limitations, would have difficulty grasping and manipulating objects, and could not be
3  routinely exposed to heights or extremes of temperature.  (CAR at 151-53.)  Yet the nurse
4  practitioner's report provides only scant objective medical findings to support these
5  conclusions, citing instead "patient's subjective report" and "reported pain" as the basis for
6  these restraints.  (CAR at 151-52.)

7  In addition to the report from her own nurse practitioner, the record contains reports
8  from two medical officials who examined Plaintiff at the request of the Social Security
9  Administration.  The first report, conducted after an examination by Dr. Bradley Daigle, is
10 critical to this appeal.  Dr. Daigle's report described Plaintiff as "alert, immature, histrionic,
11 but generally pleasant and not particularly stressed or anxious." (CAR at103.)  His
12 psychiatric evaluation notes "limited . . . emotional and mental capacity," ascribes to Plaintiff
13 a "personality disorder which has led to maladaptive outcomes and some psychosocial
14 instability," and identifies "a drug habit" that "she has apparently managed to control."
15 (CAR 105.)  Dr. Daigle found that Plaintiff would have slight limitations in her ability to
16 understand simple or detailed instructions, as well as her ability to maintain concentration on
17 her work or relate to and interact with supervisors, co-workers, and the public. (CAR 106.)
18 His evaluation further found that Plaintiff would have moderate limitations on her "ability to
19 associate with day-to-day work activity, including attendance and safety," as well as her
20 "ability to adapt to the stresses common to a normal work environment."  (CAR at 106.)
21 Nonetheless, Dr. Daigle concluded that Plaintiff "could return to employment over the
22 intermediate term." (CAR at 105.)

23 The second examiner, Dr. Sokley Khoi, used a number of cognitive and personality
24 tests to evaluate Plaintiff's condition.  (CAR at 138.)  Her report noted Plaintiff's non-
25 cooperation with some of the psychological testing, and concluded, in light of some tests
26 showing extremely low cognitive function, that the test results from her examination of
27 Plaintiff were not reliable.  (CAR at 137.)  For example, the report indicates that Plaintiff
28 complained of pain in her right hand but refused to remove her glove or permit examination

3

of the hand. (CAR 136.) It also notes that Plaintiff complained of leg and back pain. (CAR 139.) Dr. Khoi concluded that Plaintiff suffers from a non-specific personality disorder and malingering. (CAR at 138.) Her evaluation stated that Plaintiff would be only mildly impaired from adapting to changes in her job routine or withstanding the stress of a routine work day. (CAR 138.) Dr. Khoi also concluded that Plaintiff would be mildly to moderately restricted in interacting appropriately with the public, supervisors, and co-workers. (CAR at 141.)

At a hearing before the ALJ, Plaintiff and her stepmother testified about Plaintiff's inability to perform certain tasks for herself, such as filling out forms, and her difficulty in performing sustained work under her own initiative in the workplace. (CAR at 191-95.) Plaintiff's testimony was generally consistent with her application for disability benefits. (CAR at 160-178.) She was questioned by both her attorney and the ALJ and appeared to understand the proceedings, although her memory was vague about some of her job history. (See, e.g., CAR at 165.) Yet Plaintiff also gave additional testimony about psychiatric difficulties not reflected in the medical reports, such as talking to herself and hitting her head against walls as a response to stress. (CAR at 173.) Consistent with the histories she gave the consulting psychiatrist and psychologist, Plaintiff also described a past period of cocaine abuse, with seven years sobriety at the time of the hearing. (CAR at 174-75.)

Following Plaintiff's testimony, the ALJ posed three hypothetical questions to a vocational expert. First, the ALJ asked whether a person with Plaintiff's social and cognitive limitations could perform any of Plaintiff's past work. Specifically, the ALJ asked what jobs would be available to "someone [with] the claimant's age, education, and experience," including a sixth grade reading and math ability, and "[a] limitation of simple, repetitive tasks," and with only limited or occasional required contact "with the public and co-workers." (CAR at 182.) To this first hypothetical question, the vocational expert responded that two of Plaintiff's prior jobs would be available to such a person: garment sorter and labeler. The expert also indicated that forty to fifty percent of the unskilled work in the national economy would be available to someone with these limitations. (CAR at 182-83.)

4

1    Second, the ALJ posed another hypothetical question involving additional physical
2 limitations corresponding roughly to the difficulties Plaintiff described in using her right
3 hand. (CAR at 183.) The vocational expert replied that a person with those additional
4 physical limitations would not be able to perform any of the work in which Plaintiff
5 previously was engaged, but that such a person would likely be able to find work in the
6 national economy, including jobs as a "bottling line attendant," or a "production job" where
7 the employee "could use either upper extremity," or a job as "an unskilled security guard" or
8 a "night patrol inspector." (TR at 183-86.)

9    Third, the ALJ posed another hypothetical question about whether, in addition to all of
10 the restrictions previously discussed, someone with "moderate difficulties in maintaining
11 concentration, persistence, and pace" would be able to find work. (CAR 188.) The ALJ
12 specified that this moderate restriction would entail difficulties for the hypothetical worker
13 during approximately twenty percent of the work day. (CAR 188.) The vocational expert
14 replied that "there would be no work available to [that] hypothetical individual." (CAR 188.)

15    In essence, the ALJ designed his hypothetical questions to assess the workplace
16 opportunities of someone with some or all of Plaintiff's alleged infirmities. Each subsequent
17 question evaluated a hypothetical applicant with greater restrictions. The first hypothetical
18 examined whether an individual with Plaintiff's educational, and social limitations would be
19 able to find work. The expert's answer to that question was yes--not only would an
20 individual with those limitations be able to find work, but she would also be able to perform
21 two of the jobs, garment sorter and labeler, previously held by Plaintiff. The second
22 hypothetical was designed to determine whether an individual with Plaintiff's educational,
23 social, <u>and physical</u> limitations would be able to find work, or in other words, a person with
24 all of the first hypothetical person's restrictions, plus the physical limitation of wrist pain that
25 Plaintiff described in her testimony. The expert's answer to that question was a more
26 qualified yes--such a person would be unable to perform any of the jobs previously held by
27 Plaintiff, but might likely be able to find other suitable work. The third question was
28 designed to determine whether an individual with all of these restrictions, plus the

impairment of having "moderate difficulties in maintaining concentration, persistence, and pace," would be able to find employment. (CAR 188.) The vocational expert concluded that work would be unavailable to such a person.

In his written decision, the ALJ accepted Plaintiff's claimed educational, social, and psychological limitations, finding that "the claimant's impairments are severe within the meaning of the Social Security regulations." (CAR 14.) However, the ALJ explicitly found that Plaintiff "has no severe <u>physical</u> impairment that has lasted or is expected to last for a continuous period of 12 months." (CAR 14.) Specifically, he rejected Plaintiff's claim that she was restricted from working due to pain in her wrist. He concluded that he could not credit the nurse practitioner's report as evidence of physical limitation because it is not an "acceptable medical source" under federal regulations. (CAR 14 (citing 20 C.F.R. § 416.913(a)).) He also rejected the nurse practitioner's report for the alternative reason that her conclusions were not supported by any objective medical tests or other diagnostic tools. (CAR 14.)

Similarly, the ALJ rejected the idea that Plaintiff was more than "minimally limited in her functional capacity." (CAR 16.) The ALJ noted that the reports of the two medical professionals who examined Plaintiff--Dr. Daigle and Dr. Khoi--both supported the Social Security Administration's determination that Plaintiff would not be substantially unable "to adapt to changes in a job routine or withstand the stress of a routine work day." (CAR 15-16.) Because "no other limitations [were] warranted, . . . including in the claimant's ability to maintain concentration over the course of an 8-hour workday," the ALJ concluded that Plaintiff's would be "only mildly limited in her ability to sustain concentration, persistence, or pace." (CAR 16.) Because he accepted only her emotional and psychological limitations, and not limitations on her physical abilities or her inability to sustain concentration, the ALJ relied on the vocational expert's testimony that Plaintiff could perform at least some of her past work. (CAR 16-17.) As a consequence, the ALJ held that Plaintiff was not disabled and affirmed the denial of benefits. (CAR 17.)

6

**DISCUSSION**

Plaintiff raises only one argument on appeal. She contends that the ALJ erroneously failed to consider that Plaintiff was "moderately limited in her ability to associate with day-to-day work activity or to adapt to the stresses common to a normal work environment." Plaintiff notes that the ALJ explicitly adopted this "limitation" in his written opinion, which incorporated this description of Plaintiff's condition from Dr. Daigle's written examination report. (CAR 16.) She argues that the ALJ rendered his own hypothetical questions inapposite and the testimony of the vocational expert meaningless by failing to include this "limitation" in the questions he posed to the expert. See Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997) (noting that an ALJ "may elicit testimony from a vocational expert," but that the hypothetical posed to the vocational expert "must consider all of the claimant's limitations"); Newton v. Chater, 92 F.3d 688, 985 (8th Cir. 1996) (reversing a denial of benefits and remanding where the ALJ neglected to include in his hypothetical questions to the vocational expert a description of the claimant's "deficiencies of concentration, persistence, or pace"). Plaintiff argues that the ALJ's error requires remand for reconsideration of her residual functional capacity in light of all the applicable limitations on her ability to work, not merely some of them.

The Court disagrees that the ALJ's decision was legally erroneous. The first hypothetical question posed by the ALJ incorporated the following limitations: (1) a limitation of employment using only simple, repetitive tasks, (2) a limitation of employment demanding only limited or occasional contact with the public and co-workers, and (3) a limitation of work requiring reading and math skills at only a sixth grade level. (CAR 182.) In addition to these three limitations, Plaintiff would require one more--namely, her inability "to associate with day-to-day work activity or to adapt to the stresses common to a normal work environment."

The Court is satisfied, however, that the three limitations listed by the ALJ adequately captured the purported fourth "limitation" identified in Dr. Daigle's statement that Plaintiff would be "moderately limited in her ability to associate with day-to-day work activity or to

7

1  adapt to the stresses common to a normal work environment." Indeed, the Court agrees with
2  the ALJ's remark that Dr. Daigle's "finding" was "encompassed by [the conclusion] that the
3  claimant would be able to perform simple repetitive tasks and interact only occasionally with
4  others." (CAR 16.) This remark by the ALJ is not merely an *ipse dixit*, as Plaintiff contends.
5  Rather, it is a recognition of the ALJ's responsibility to review all relevant medical records,
6  discern the physical, mental, and other limitations that are supported by the evidence, and
7  communicate those limitations completely and coherently. See 20 C.F.R § 420.920(e)(noting
8  the ALJ's duty to "make a finding about [the claimant's] residual functional capacity based
9  on all the relevant medical and other evidence in [the] case record"). The ALJ performed
10 precisely that task, reviewing all of Plaintiff's medical records and synthesizing these records
11 into a description of her physical abilities, id. § 416.945(b), mental abilities, id. § 416.945(c),
12 and other medically determinable impairments, id. § 416.945(d), which collectively
13 constitute the claimant's residual functional capacity.
14         It is true that federal law requires the ALJ to describe "all of the claimant's functional
15 limitations, both physical and mental," in order to justify reliance on hypothetical questions
16 posed to a vocational expert. Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002)
17 (emphasis added). But it does not follow from this requirement that an ALJ must transmit to
18 the vocational expert each and every relevant description in the medical record of the
19 claimant's impairments in order to justify reliance upon the expert's testimony. See id.
20 (holding that the ALJ "adequately incorporated the functional limitations" of the claimant by
21 referring to certain medical records, and rejecting the contention that the law "required the
22 ALJ to articulate specifically that [the claimant] had deficiencies in concentration,
23 persistence or pace"). An ALJ need not recite verbatim a doctor's particular manner of
24 expressing a limitation; rather, he is permitted to review the record and communicate all
25 limitations supported by the record in a fashion that accurately reflects a claimant's
26 condition. Cf. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (noting that it is the
27 task of the ALJ to review the record as a whole, to resolve ambiguities, and to make only
28 determinations about a claimant's residual functional capacity that are supported by

substantial evidence).  Here, the Court is satisfied that the so-called "limitation" described by Dr. Daigle and accepted by the ALJ was accurately and adequately communicated to the vocational examiner through the ALJ's first hypothetical question.

## CONCLUSION

The Court holds that the ALJ did not commit legal error by failing to incorporate all relevant limitations into its hypothetical questions.  To the contrary, the Court holds that the only limitations relevant to Plaintiff's residual functional capacity were adequately reflected in the hypothetical questions posed by the ALJ.  Because the ALJ's questions accurately reflected Plaintiff's limitations, the vocational expert's testimony was valid and the ALJ's reliance upon it was justified.  Accordingly, this Court cannot say that the ALJ's decision was unsupported by substantial evidence or based on legal error.  Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005).  Plaintiff's motion for summary judgment is DENIED, and Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  November 17, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE